672 F.2d 150
 109 L.R.R.M. (BNA) 2959, 28 Fair Empl.Prac.Cas. 185,
28 Empl. Prac. Dec. P 32,495, 217 U.S.App.D.C. 297
 Robert J. FRAZIER, Jr., Terry E. Love, Charles E. Morris,
William C. Reilly, Petitioners,
v.
MERIT SYSTEMS PROTECTION BOARD and Department of Justice, Respondents,
William E. Hall, Paul R. Michael and Benjamin R. Civiletti,
Intervenors.
Robert J. FRAZIER, Jr., Petitioner,
v.
MERIT SYSTEMS PROTECTION BOARD, Respondent,
William E. Hall, Director, U.S. Marshals Service, et al., Intervenors.
 Nos. 80-1067, 80-1986.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 17, 1981.
Decided March 2, 1982.
 
 Mark D. Roth, Washington, D. C., for petitioners.
 Jane M. Edmisten, Deputy Gen. Counsel, Merit Systems Protection Board, Washington, D. C., for respondents.
 Jeffrey Hiller, Washington, D. C., for amicus curiae, Government Accountability Project, urging reversal.
 Alice Daniel, Asst. Atty. Gen., William Kanter and Howard S. Scher, Attys., Dept. of Justice, Washington, D. C., were on the brief for intervenors, Hall, et al. Patricia G. Reeves, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for intervenors, Hall, et al.
 Before BAZELON and McGOWAN, Senior Circuit Judges, and WILKEY, Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 BAZELON, Senior Circuit Judge:
 
 
 1
 This case presents a number of important questions of first impression arising under the Civil Service Reform Act of 1978 (CSRA or Act). A central purpose of the Act is to provide increased protection for "whistleblowers," federal employees seeking to disclose wrongdoing in the government. The Act authorizes the Merit Systems Protection Board (MSPB or Board), on petition of an independent Special Counsel, to order "corrective action" by federal agencies whose officials have sought to retaliate against whistleblowers. Petitioners, four former Deputy U.S. Marshals, seek review of the Board's first corrective action decision.
 
 
 2
 In a petition to the Board, the Special Counsel contended that the four deputies were transferred from their duty stations because they had (1) complained to two U.S. Congressmen about alleged wrongdoing in the Marshals Service and (2) filed equal employment opportunity grievances against their superiors. Following an evidentiary hearing, the Board upheld the transfers of three of the deputies and rescinded that of the fourth.
 
 
 3
 In No. 80-1986, Deputy Frazier, whose transfer was rescinded by the Board, challenges the Board's conclusion that it lacked authority to award him attorney's fees. We hold that the CSRA provides such authority in any case in which an employee or applicant for employment appears as a party. We remand for the Board to consider whether fees should be granted in this case.
 
 
 4
 In No. 80-1067, all four of the deputies challenge (1) the Board's authority to hold a hearing, (2) its allocation of the burden of proof, and (3) its standard for judging retaliatory intent. The Board, for its part, suggests that the petition is moot and, in any event, not appealable to this court. We hold that we have jurisdiction to hear the appeal and that the contentions of three of the deputies are not moot; but since the fourth deputy, Frazier, received all the relief he sought, his petition is dismissed as moot. On the merits, we find the Board's analysis of the issues consistent with the provisions of the Act governing corrective action proceedings. With respect to Deputies Morris, Reilly, and Love, the decision of the Board is affirmed.
 
 
 5
 Because this is the first case interpreting the corrective action provisions of the CSRA, we think it helpful to set forth the legal and factual background in some detail. Accordingly, before discussing the legal issues, we will canvass the history and structure of the relevant sections, the facts that gave rise to the present dispute, and the procedures and conclusions adopted by the Board.
 
 I. BACKGROUND
 
 6
 A. Statutory scheme.
 
 
 7
 The CSRA constituted the first comprehensive reform of the federal civil service system since passage of the Pendleton Act in 1883. A product of the nineteenth century progressive movement, the Pendleton Act had sought to replace the "spoils system," under which the President could dispense federal jobs as rewards for political patronage, with a "merit system" that would base selection and promotion of most civil servants on competence. The Pendleton Act also established a Civil Service Commission charged both with protecting the merit principle and with managing the growing federal bureaucracy.[1]
 
 
 8
 In subsequent years, an increasing proportion of the federal workforce was classified in the competitive service. As the Commission's management functions grew more complex, it was also compelled to elaborate a wide variety of merit system rules without guidance from Congress. Delay and inefficiency increasingly characterized the procedures required to discipline unsatisfactory employees.[2] At the same time, several celebrated episodes suggested that efforts by employees to call attention to government waste and fraud were often inhibited by the threat of retaliatory personnel actions.[3] The dual responsibility of the Civil Service Commission for management and merit protection seemed to pose a barrier against mitigating these problems.[4]
 
 
 9
 In 1978, these and other concerns led President Carter to propose legislation that would significantly restructure the civil service. Among the legislative objectives identified by the President in his message to Congress were:
 
 
 10
 To strengthen the protection of legitimate employee rights;
 
 
 11
 To provide incentives and opportunities for managers to improve the efficiency and responsiveness of the Federal Government; (and)
 
 
 12
 To reduce the redtape and costly delay in the present personnel system (.)[5]
 
 
 13
 Another important purpose of the proposals, as noted by the legislation's Senate manager, Senator Ribicoff, was to "(p)rovide( ) new protections for employees who disclose illegal or improper Government conduct."[6]
 
 
 14
 As enacted, the CSRA includes several basic features intended to achieve these goals. Title I of the Act consists of the first statutory expression of the merit system principles that have evolved since the creation of the Civil Service Commission. In addition to detailing the requirement that personnel decisions rest on evaluations of competence, Title I announces a statutory policy of protecting whistleblowers. The Act provides:
 
 
 15
 Employees should be protected against reprisal for the lawful disclosure of information which the employees reasonably believe evidences-
 
 
 16
 (A) a violation of any law, rule, or regulation, or
 
 
 17
 (B) mismanagement, a gross waste of funds, an abuse of authority, or a substantial danger to public health or safety.
 
 
 18
 Section 2301(b)(9).[7] Title I also defines a variety of "prohibited personnel practices" including actions taken in retaliation for whistleblowing, section 2302(b)(8), and those taken as a reprisal "for the exercise of any appeal right granted by any law, rule, or regulation." Section 2302(b)(9).
 
 
 19
 Title II of the CSRA abolishes the Civil Service Commission and replaces it with two new agencies, the MSPB and the Office of Personnel Management (OPM). The OPM, headed by a single director responsible to the President, supervises the administration of the civil service. The MSPB, an independent agency consisting of three members, is charged with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies. See sections 1201-05. The Act also establishes within the Board an independent Special Counsel responsible for investigating and prosecuting prohibited personnel practices, employment discrimination, unlawful political activities, arbitrary withholding of information requested under the Freedom of Information Act, and any other violations of law within the federal civil service. See sections 1204 & 1206.
 
 
 20
 As detailed in Title II, the Board's principal duty is to mediate the recurring conflict between the two most important goals of the CSRA: protection of employee rights and enhancement of government efficiency. There are essentially two ways in which such controversies may reach the Board: The first is through "Chapter 77" appeals[8] brought by individual employees complaining of adverse agency personnel actions.[9] The Board's role as the final administrative arbiter of such complaints is inherited from the Civil Service Commission. Secondly, section 1206(c)(1)(B) of the Act authorizes the Special Counsel to petition the Board for "corrective action" against agencies or employees engaged in prohibited personnel practices. Unlike appeals, corrective action proceedings have no counterpart in pre-CSRA law.
 
 
 21
 Chapter 77 confers on federal employees a broad right to challenge personnel decisions before the Board. Section 7701(a) provides: "Any employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." Actions explicitly deemed appealable include reductions in grade and removals based on unacceptable performance, section 4303(e), and enumerated "adverse actions" taken for other reasons.[10] Section 7513(d). Chapter 77 details the procedures governing appeals to the Board and contains provisions related to attorney's fees and judicial review.
 
 
 22
 Section 1206, in contrast, elaborates the "corrective action" authority of the Special Counsel without reference to the appeal rights of individual employees. The Act instructs the Special Counsel to "receive any allegation of a prohibited personnel practice and (to) investigate the allegations to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." Section 1206(a)(1). If the focus of the allegations concerns whistleblowing, the Special Counsel must convey the substance of the whistleblower's claims to the relevant agency but may not disclose the identity of the complaining employee without the latter's consent. Sections 1206(b)(1) & (2).[11]
 
 
 23
 The Special Counsel's initial investigation may reveal, in addition to alleged wrongdoing within the responsibility of other authorities, evidence of prohibited personnel practices correctable by the Board. In that event, the Special Counsel must first seek an accommodation with the agency involved; if that effort fails, the Special Counsel may request a corrective order by the Board. Specifically, section 1206(c)(1) provides:
 
 
 24
 (A) If, in connection with any investigation under this section, the Special Counsel determines that there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken which requires corrective action, the Special Counsel shall report the determination together with any findings or recommendations to the Board, the agency involved, and to the (OPM), and may report the determination, findings, and recommendations to the President. The Special Counsel may include in the report recommendations as to what corrective action should be taken.
 
 
 25
 (B) If, after a reasonable period, the agency has not taken the corrective action recommended, the Special Counsel may request the Board to consider the matter. The Board may order such corrective action as the Board considers appropriate, after opportunity for comment by the agency concerned and the (OPM).
 
 
 26
 Section 1208 permits the Special Counsel to request, and the Board to grant, stays of personnel actions the Special Counsel reasonably believes are grounded in prohibited practices.
 
 
 27
 B. Proceedings before the Board.
 
 
 28
 1. The Special Counsel's petition. In early 1979, the Special Counsel received allegations that four Deputy U.S. Marshals assigned to the Northern District of Georgia were about to be transferred to other districts in retaliation for engaging in activities protected by the Act. In the course of an investigation, the Special Counsel determined that there were reasonable grounds to support the claims and therefore asked the Board to stay the transfers pursuant to section 1208. The Board granted the request as well as a subsequent petition for extension of the stay.[12] As of the time of the Board's decision under review, the transfers had not taken place.
 
 
 29
 On completion of the investigation, the Special Counsel filed a report with the Board, the Office of Personnel Management, and the Department of Justice (of which the Marshals Service is a part) pursuant to section 1206(c)(1)(A). The report concluded that there was evidence to support the deputies' claims that their transfers were ordered in reprisal for protected activities. Specifically, the report determined that the four deputies had all filed several equal employment opportunity complaints, an "appeal right" within section 2302(b)(9), and that they had complained about the management of the Marshals Service to two United States Congressmen, a form of disclosure protected by the whistleblowing provisions of section 2302(b)(8)(A). The Special Counsel concluded that these activities may have formed the basis for the transfer orders.
 
 
 30
 In a letter accompanying the report, the Special Counsel recommended, among other things, that the Attorney General rescind the transfers. The Attorney General declined, asserting that the Marshals Service had not engaged in retaliation but had instead reassigned the deputies for the sound management purpose of relieving irreconcilable personality conflicts in the Atlanta Marshals office. When several efforts to resolve the matter informally failed, the Special Counsel filed a petition for corrective action with the Board, citing section 1206(c)(1)(B). The petition repeated the charges contained in the earlier report and asked the Board to enforce the recommendation that the transfers be rescinded.
 
 
 31
 2. Prehearing developments. Shortly after responsive pleadings were filed, the American Federation of Government Employees (AFGE) moved to intervene in the proceeding. By order of July 12, 1979, the Board treated the AFGE pleading as a motion by AFGE attorneys "to appear on behalf of the petitioners" and granted it. I J.A. 237. On the same day, the Board issued a pretrial order governing discovery and set the matter "for a trial on the merits before the Board." I J.A. 239-40. This was followed by an order permitting the deputies "fully (to) participate in this proceeding as any other party." I J.A. 250.
 
 
 32
 Both the AFGE attorneys and the Special Counsel objected to the Board's decision to hold an evidentiary hearing. The Board overruled the objections and conducted four days of hearings. Over further objection by the complaining parties, the Board assigned the burden of proof to the Special Counsel.
 
 
 33
 3. The factual background. The Board's final decision[13] set forth extensive findings of fact. Those relevant here may be briefly summarized: The Atlanta office of the U.S. Marshals Service had apparently experienced morale problems for some time prior to the appointment of Marshal Ronald Angel in September 1977. The Board found, for example, that the Northern District "was the source of an unusually large number of complaints charging equal employment opportunity (EEO) violations."[14] In particular, all four petitioners in this case had been involved to varying degrees in the presentation of EEO grievances throughout 1977 and 1978. In the late spring of 1978, a group of deputies that, at various times, included all four petitioners, brought complaints about the management of the district to two U.S. Congressmen. The Board found that, in general, the deputies alleged "harassment and racial discrimination against blacks; incompetent supervisors; problems in the transportation of prisoners" and improprieties at an office training session and barbeque held earlier that spring at a local pistol range.[15] The deputies provided the Congressmen and their staffs with documents purporting to support their claims.
 
 
 34
 Efforts by one of the Congressmen's aides to pursue the complaints came to the attention of Frank Vandergrift, Chief of General Operations for the Marshals Service. After making some inquiries in Atlanta, Vandergrift referred the matter to Ray Lora, Acting Special Assistant for EEO Affairs, and reported his visit and the referral to the Deputy Director of the Service. On July 16, 1978, Lora arrived in Atlanta and began an investigation that included meetings with Marshal Angel, the petitioners, other members of the Northern District staff and the congressional aide who had prompted the investigation. Immediately after Lora's visit, Marshal Angel wrote to Marshals Service Director William Hall, recommending the transfer of three of the petitioners in this case (Frazier, Morris, and Reilly) as well as a fourth deputy. On his return from Atlanta, Lora discussed his investigation with Hall "in terms of management problems in the Northern District and the polarization of staff there" and told Hall he agreed with Angel's transfer recommendations.[16]
 
 
 35
 Hall did not act on the recommendation at that time. In the ensuing months, however, he received reports of continuing difficulties in the Atlanta office. In late December 1978, Marshal Angel visited Service headquarters in Washington to discuss the problems. Following that visit, Hall appointed a management review team "to investigate all facets of the Atlanta office's operation and to make any recommendation that would rectify the problems in that office."[17] The team's investigation lasted several days and, in January 1979, the team issued a report to Hall that, among other things, recommended the transfer of petitioners Frazier, Morris, Reilly, and Love.[18] On January 29, 1978, Director Hall ordered all four transferred to different Marshals offices throughout the country.
 
 
 36
 4. The Board's conclusions. The Board determined that the deputies' disclosures to the two Congressmen were protected by the whistleblowing provisions of the CSRA.[19] The Board further concluded that, to support a finding of prohibited personnel practices, the Special Counsel must show "that the official accused of taking the retaliatory action against the whistleblower had knowledge that the protected disclosure had been made and by whom."[20] Accordingly, the Board next considered whether Director Hall had "actual or constructive knowledge" of the visits by the deputies to the two congressional offices.[21] The Board determined that while Marshal Angel, Chief of Operations Vandergrift, and Special Assistant Lora may have known about the whistleblowing, none of the three had identified the complaining deputies to Hall. The Board credited Hall's testimony that, while he knew there had been congressional contacts, "he did not know at the time he ordered the transfers who (the whistleblowing) deputies were, and ... he did not consider the congressional contacts in reaching the decision."[22] Rather, the Board decided, Hall relied entirely on the recommendations of the management review team. Moreover, the Board concluded, the team members "did not know that the four deputies whose transfers they recommended had made disclosures" to the Congressmen.[23]
 
 
 37
 The Board also decided that the transfers of Morris, Reilly, and Love had not been ordered in reprisal for their EEO activities. The Board found "no persuasive evidence" that either the review team or Hall were aware of any such activities by Reilly and Love.[24] With respect to Morris, the Board did find that two team members and Director Hall knew about his EEO complaint but concluded nevertheless that the complaint had not been considered in the decision to transfer him.[25] The Board thus upheld the transfers of Reilly, Love, and Morris.
 
 
 38
 The Board decided that Frazier's more frequent and extensive EEO activities "were known to and considered by the management review team in recommending his transfer."[26] The Board attributed to Hall the retaliatory intent against Frazier that it found in the management of the Atlanta office
 
 
 39
 because of its widespread nature and because of the repeated direct involvement of headquarters in Frazier's EEO matters. From this, the Board infers that Mr. Hall was at least a silent participant in retaliation against Frazier.[27]
 
 
 40
 Accordingly, the Board directed the Marshals Service to rescind Frazier's transfer and to cease retaliating against him for his EEO activities.
 
 
 41
 II. THRESHOLD ISSUES.
 
 
 42
 A. Appealability.
 
 
 43
 Section 7703 of the CSRA, together with 28 U.S.C. § 2342 (Supp. III 1979),[28] gives the court of appeals exclusive jurisdiction to review a final order of the MSPB on petition of "(a)ny employee or applicant for employment adversely affected or aggrieved"[29] by a Board decision. For reasons explained in Part B below, we are satisfied that three of the petitioners remain "adversely affected" by the order sustaining their transfers.[30] The Board nevertheless suggests that the placement of section 7703 in the chapter of the Act concerned with the Board's appellate authority, see p. 155 supra, prevents its application to other chapters in the Act, including those governing corrective action petitions brought by the Special Counsel.
 
 
 44
 We reject the Board's argument. While section 7703 does appear in Chapter 77, which concerns employee appeals to the Board, its language broadly encompasses any "final order or decision" of the Board. Similarly, Title 28's grant of jurisdiction to the court of appeals, enacted along with the CSRA, covers "all final orders of the Merit Systems Protection Board." Nothing in these provisions limits their applicability to those final orders arising out of Chapter 77 appeals. Nor does the fact that the phrase "final order or decision" appears under a heading concerned with a particular type of proceeding narrow the plain meaning of the words. Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co., 331 U.S. 519, 527-29, 67 S.Ct. 1387, 1391-92, 91 L.Ed. 1646 (1947).
 
 
 45
 The legislative history of section 7703 makes clear that it was meant to have the broad reach indicated by its language. In discussing the original version of the section, the report of the Senate Committee on Governmental Affairs specifically referred to its use "under any other sections" of the statute.[31] Moreover, the report cited section 1205(a)(2), the provision governing Special Counsel petitions for stays, as an illustration of one of the "other sections" to which section 7703 applies.[32] Since the stay provision appears in the same part of the Act under which the instant case was brought, its use as an example in the report provides strong support for our conclusion that section 7703 properly applies to this case.
 
 
 46
 B. Mootness.
 
 
 47
 The Board contends that Frazier, whose transfer was set aside, obtained the remedy he sought and that his petition should therefore be dismissed as moot. In addition, the Board states that all four of the petitioners in this case left the Marshals Service either shortly before or some time after the Board's decision was announced.[33] Since neither the court nor the Board can order the Service to reassign individuals no longer in its employ, the Board argues, petitioners' request for review of the Board's decision fails to present a "case or controversy" as required by Article III of the Constitution.
 
 
 48
 1. Frazier. In his petition on the merits, Frazier attacks a Board decision that granted him all the relief he requested. The Board agreed with Frazier that his transfer had been improperly based on the exercise of protected EEO appeal rights and therefore ordered the reassignment rescinded.[34] Frazier nevertheless asserts that "he is still ... 'chilled' by the Board's erroneous decision regarding" his whistleblowing activities. Reply Brief for Frazier at 4-5. The Board did not, however, attempt to limit such activities in any way. It merely concluded that Frazier's disclosures to Congressmen, which he remains free to continue, did not result in his transfer. Even if we determined that the Board's decision on this point was incorrect, Frazier would be entitled to no more relief than he has already received. Under these circumstances, Frazier presents us with no continuing controversy and we will therefore dismiss his petition in No. 80-1067.
 
 
 49
 2. Morris, Reilly, and Love. While the Board sustained the reassignments of the other three deputies, respondents correctly point out that the departure of the three from the Service has rendered mere rescission of the transfers a meaningless remedy. The fact that subsequent events have made the originally requested form of relief inappropriate, however, does not mean that the Board's decision lacks any continuing effect on petitioners. The personnel actions sustained by the Board were explicitly based on negative characterizations of the personalities and work attitudes of the deputies.[35] These official comments, which the Board deemed justified,[36] presumably remain on the deputies' records and may affect their future employment prospects, both in and outside of government. Furthermore, if, as petitioners allege, the transfers wrongfully forced the deputies to resign, they may be entitled to reinstatement or monetary compensation.[37] The Board's decision, if unreviewed, could pose a serious obstacle to the assertion of any such claims.[38] Accordingly, we conclude "that the underlying adversariness of the parties before us, the existence of a controversy (before the Board) that was concrete, real and immediate, and the persistence of elements of that controversy in the continuing relations of the parties," establish that the case is not constitutionally moot.[39] Alton & Southern Railway Co. v. International Association of Machinists and Aerospace Workers, 463 F.2d 872, 877 (D.C.Cir.1972).
 
 
 50
 III. PROCEDURES GOVERNING CORRECTIVE ACTION CASES
 
 
 51
 We turn, then, to the merits. The provisions of the CSRA governing corrective actions lack both the detail and the historical background of other sections of the Act. See p. 155 supra. Accordingly, we must begin by briefly exploring the purposes of this new type of proceeding. In that effort, we are guided not only by our usual policy of deferring to an agency's interpretation of its enabling act, but especially by the requirement that we pay heed to the "contemporaneous construction of a (new) statute by (those) charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."[40]
 
 
 52
 A. Nature of the Proceeding.
 
 
 53
 While petitioners seem to view the Special Counsel as both "public defender" for federal employees and the final judge of whistleblowing claims, the Board conceives the Special Counsel more as a prosecutor charged with vindicating the Act's goal of achieving a fair, efficient, and lawfully-conducted Civil Service. The Board thus draws a significant distinction between the purpose of a corrective action proceeding and that of a Chapter 77 appeal. While appeals concern personal employment disputes, the Board argues, the "thrust (of corrective action petitions) is toward systemic, not individual problems in the federal merit sytem ...." Brief for Respondents at 35, n.17.
 
 
 54
 The Board's analysis of the Special Counsel's role is supported by the language and legislative history of the Act. It is evident on the face of the statute that the Special Counsel may seek to remedy prohibited practices that do not aggrieve any particular employee. See p. 154 supra. Moreover, even in cases initiated by a complaining employee, the Special Counsel can apparently make compromises with the agency involved, seek corrective action short of that requested by the complainant, and, we assume, refuse to pursue the case at all.[41] Quite clearly, then, the duties of the Special Counsel are not equivalent to those of an employees' advocate.
 
 
 55
 Rather, the authors of the CSRA apparently expected the Special Counsel to act as an ombudsman responsible for investigating and prosecuting violations of the Act.[42] The Special Counsel was modeled after the General Counsel of the National Labor Relations Board (NLRB) who performs an independent prosecutorial role with respect to employment relations in the private sector.[43] Furthermore, the reports and debates concerning the CSRA are replete with characterizations of the Special Counsel as a "prosecutor" or "watchdog" of merit system abuses.[44] In short, if Chapter 77 appeals can be analogized to civil proceedings in which the immediate interests are personal to the litigants, corrective action petitions are comparable to criminal prosecutions designed to vindicate the public interest.
 
 
 56
 On this view of the Act, the principal recourse for individual employees who have suffered cognizable injury from a personnel action is to a Chapter 77 appeal-and not to the office of Special Counsel. But see note 41 supra. There will, of course, be many instances in which the interests of the Special Counsel and of a particular employee converge. An individual improperly discharged for whistleblowing, for example, could presumably seek the assistance of the Special Counsel in a Chapter 77 appeal[45] or forego that route entirely and rely on the Special Counsel to remedy the separation through a corrective action petition. Moreover, the Board may possess authority to merge corrective action and Chapter 77 appeals when they arise from the same set of facts.[46] Even in situations like those posited, however, the roles of the individual employee and the Special Counsel may differ. While the former seeks personal restoration, the latter is fundamentally concerned with the integrity of the merit system. As the Senate Report explained:
 
 
 57
 The Special Counsel should not passively await employee complaints, but rather, vigorously pursue merit system abuses on a systematic basis. He should seek action by the Merit Board to eliminate both individual instances of merit abuse and patterns of prohibited personnel practices.[47]
 
 
 58
 B. The Evidentiary Hearing.
 
 
 59
 Having established the nature of the new corrective action proceeding and the role of the Special Counsel, we can now consider petitioners' various challenges to the procedures employed by the Board. Petitioners' first claim is that the Board exceeded its authority in conducting an evidentiary hearing on the facts underlying the deputies' allegations. Instead, they argue, the Board was bound by the legal and factual conclusions of the Special Counsel and was limited to determining the appropriate remedy. In response, the Board contends that the authority of the Special Counsel extends only to investigation and prosecution and that all adjudicatory power is lodged in the Board itself.
 
 
 60
 We agree with the Board. As outlined above, the language and history of the Act consistently describe the Special Counsel in terms that suggest a prosecutor rather than a judge. The same sources clearly assign adjudicatory functions to the Board. Section 1205(a)(1) of the Act, for instance, grants the Board comprehensive power to hear and adjudicate all matters within its purview.[48] With respect to petitions brought by the Special Counsel, section 1208 gives the Board final authority to issue stays and section 1207 requires the Board to conduct a hearing when the Special Counsel's complaint is directed at an individual. See note 42 supra.
 
 
 61
 Moreover, the corrective action section itself is cast in terms that evoke a prosecutor-judge relationship between the Special Counsel and the Board. When the Special Counsel finds "reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken," he or she "may request " action by the Board. Section 1206(c)(1)(A) & (B) (emphasis added). The Board correctly points out that these phrases are typically employed in defining the standard for bringing an enforcement action.[49] Together with the constant references in the legislative history to the Board's "quasi-judicial" role,[50] the Act's language undermines petitioners' argument that the Special Counsel's determinations are binding on the Board.[51]
 
 
 62
 In light of its broad responsibility to adjudicate merit system disputes, the Board certainly has authority to conduct evidentiary hearings in appropriate cases. As previously noted, section 1205(a)(1) allows the Board to "hear, adjudicate, or provide for the hearing or adjudication, of all matters within (its) jurisdiction ...." While the corrective action sections do not require a hearing when the respondent is an agency rather than an individual,[52] we have often emphasized that agencies may "adopt procedures beyond the minima explicitly prescribed by statute." FTC v. Brigadier Industries Corp., 613 F.2d 1110, 1115 (D.C.Cir.1979). See also Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978); O'Donnell v. Shaffer, 491 F.2d 59, 62 (D.C.Cir.1974). In light of the serious factual disputes and credibility issues raised by the Special Counsel's petition, we believe the Board acted reasonably in ordering a hearing in this case.
 
 
 63
 C. Burden of Proof.
 
 
 64
 Petitioners next contend that the Board erred in requiring the Special Counsel to prove the existence of prohibited personnel practices by the preponderance of the evidence. Asserting that the Board must at least give the determinations of the Special Counsel "great deference," the deputies argue that the filing of a corrective action petition makes out a prima facie case which the charged agency must rebut by clear and convincing evidence. Respondents counter that the Board's allocation of the burden of proof is supported by other provisions of the Act and by the case law in analogous areas.
 
 
 65
 As section 1206 is silent on the question of which party bears the burden of proof, we must sustain the Board's choice if it is consistent with the statutory scheme and reasonable. See FCC v. Schreiber, 381 U.S. 279, 290-94, 85 S.Ct. 1459, 1467-69, 14 L.Ed.2d 383 (1965). We believe the Board's analysis satisfies these criteria. In Chapter 77 appeals, an agency seeking to take a challenged personnel action bears the burden of showing that its decision is justified by concerns for the efficiency of the civil service. See section 7701(c)(1). Yet the employee, and not the agency, apparently bears the burden of proving allegations of prohibited personnel practices. See section 7701(c) (2)(B).[53] These provisions may reflect a congressional assumption that agency reprisals are relatively exceptional[54] and that official regularity in this regard should be presumed. See Mazaleski v. Treusdell, 562 F.2d 701, 717 n.38 (D.C.Cir.1977). The Board could reasonably conclude that, especially in light of the prosecutorial nature of the proceeding, see p. 162 supra, the same principle should apply in a corrective action case.
 
 
 66
 Requiring the Special Counsel to demonstrate that an agency's action was improperly based on retaliatory motives is also consistent with the rule in other employment contexts. A public employee claiming a violation of the first amendment, for instance, must prove that protected activities constituted a substantial cause of a disciplinary action. Mount Healthy City School District v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).[55] Similarly, both the General Counsel of the NLRB and employees asserting rights under the Civil Rights Act bear the burden of demonstrating prohibited reprisal motives in discharge cases. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981) (civil rights); Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980), cert. denied, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981) (civil rights); Abilene Sheet Metal, Inc. v. NLRB, 619 F.2d 332, 339 (5th Cir. 1980); District 65, Distributive Workers of America v. NLRB, 593 F.2d 1155, 1165 (D.C.Cir.1978). See also Wilson v. Thompson, 593 F.2d 1375, 1384-87 (5th Cir. 1979) (allegations of prosecution brought in retaliation for first amendment activities).
 
 
 67
 D. Elements of a Reprisal Case.
 
 
 68
 As noted above, p. 157 supra, the Board decided that, in order to demonstrate the existence of prohibited personnel practices, the Special Counsel must prove "that the official accused of taking the retaliatory action against the whistleblower had knowledge that the protected disclosure had been made and by whom." Petitioners agree with the Board that official knowledge of protected activities constitutes an essential element of a reprisal finding. They read the Board's opinion, however, as requiring a showing of direct, personal knowledge by the final agency decisionmaker. Such a requirement, petitioners argue, conflicts with the purpose of the whistleblower provisions of the CSRA by permitting prohibited retaliations to be insulated by layers of bureaucratic "ignorance." Moreover, petitioners claim, the Board's imposition of an actual knowledge requirement with respect to the disclosures is inconsistent with the Board's treatment of the EEO-related claims.[56]
 
 
 69
 There can be no doubt that a rule limiting retaliation findings to situations in which the top agency official has actual knowledge of the protected activities would seriously undercut the CSRA's goal of strengthening management accountability. Section 2302(c), for instance, provides:
 
 
 70
 The head of each agency shall be responsible for the prevention of prohibited personnel practices, for the compliance with and enforcement of applicable civil service laws, rules, and regulations, and other aspects of personnel management. Any individual to whom the head of an agency delegates authority for personnel management, or for any aspect thereof, shall be similarly responsible within the limits of the delegation.
 
 
 71
 In elaborating on this provision, the Senate Report explained, "to the extent that managerial or supervisory authority is delegated, this section means that responsibility for insuring compliance with the merit system, and potential disciplinary liability for failing to ensure compliance, will follow such a delegation."[57] The report continued:
 
 
 72
 The delegation will not, however, relieve the head of the executive agency or other top officials for ultimate responsibility for personnel actions and policies within the agency, to the extent that such officials have knowledge or should have knowledge of the actions taken or policies implemented. (Emphasis added.)[58]
 
 
 73
 Thus, the statute imposes on agency heads an affirmative obligation to prevent prohibited practices of which they are or should be aware. We agree with petitioners, therefore, that constructive knowledge of protected activities on the part of one with ultimate responsibility for a personnel action may support an inference of retaliatory intent. Moreover, while delegation of authority does not relieve an agency head of responsibility, subordinates with power to effect a personnel action may also be called to account. Thus, section 2302(b) expressly prohibits "(a)ny employee who has authority to take, direct others to take, recommend, or approve any personnel action" from taking such an action for prohibited reasons.
 
 
 74
 While the Board's opinion could have been clearer, we believe it adequately conformed to these principles. With respect to the agency head, the Board was explicit:We are compelled by the record here to conclude that Director Hall did not have actual or constructive knowledge that these deputies had engaged in protected activities. Rather, he acted in full reliance upon the recommendation of the management review team which ... was for the most part based upon sound management considerations.[59]
 
 
 75
 In support of these conclusions, the Board detailed the evidence showing Hall's lack of actual knowledge and noted the absence of evidence to the contrary.[60] The Board then considered the Special Counsel's argument that knowledge of the disclosures by the management review team should be attributed to Hall.[61] On review of the evidence, the Board rejected the factual predicate of the argument, crediting the uniform testimony of the team's members "that they did not know that the four deputies whose transfers they recommended had made disclosures" to the congressmen.[62] Finally, the Board found no basis for application of the "small plant" doctrine, a labor law rule attributing knowledge of protected activities to employers of relatively small labor forces.[63] Although the Board occasionally employed the phrase "actual knowledge" in its treatment of these points, its analysis implicitly acknowledged the possibility that a finding of retaliation could be based on constructive knowledge as well.
 
 
 76
 The Board also recognized that retaliatory intent on the part of Hall's subordinates, even if not attributable to the Director, could form the basis of a prohibited practice to the extent that they contributed to the decision to take the personnel actions. The only individuals whose views might have lead to the transfer orders and who knew about the whistleblowing were three officials of the Marshals Service: Angel, Lora, and Vandergrift. See p. 157 supra. The evidence did not indicate that either Vandergrift or Lora had played any role in the decision to transfer the deputies.[64] While Angel did seek the reassignment of three of the petitioners, the Board determined that his suggestion played no part in the ultimate decision:
 
 
 77
 (A)ssuming that Marshal Angel had the requisite knowledge and acted with retaliatory intent in recommending the transfers of Deputies Frazier, Reilly, Morris, and Jordan, that recommendation was a nullity since Hall did not act on it. Instead, Hall ordered the transfers of Chief Deputy Bowler and Deputies Love, Reilly, Morris, and Frazier, acting in reliance upon the recommendations of the management review team.[65]
 
 
 78
 In sum, the Special Counsel alleged that officials of the Marshals Service recommended or ordered personnel actions in retaliation for protected activities. The Board properly assumed that such a claim presupposes that individuals with actual or constructive knowledge of the activities helped cause the personnel actions. Fairly read, the Board's opinion determined that, in this case, those who effected the transfers had no knowledge and those with knowledge had no effect.
 
 
 79
 E. Attorney's Fees.
 
 
 80
 Frazier, whose transfer was rescinded by the Board, challenges the Board's refusal to award him attorney's fees. The Board concluded that the authority to award fees granted by section 7701(g) of the Act does not extend to corrective action proceedings. Relying on the language, placement, and history of the section, the Board decided that its power to grant fees was limited to Chapter 77 appeal cases.
 
 
 81
 We begin by noting that monetary liability may not be imposed against a federal agency unless Congress has clearly waived sovereign immunity. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 267-68, 95 S.Ct. 1612, 1626-27, 44 L.Ed.2d 141 (1975); N.A.A.C.P. v. Civiletti, 609 F.2d 514, 516 (D.C.Cir.1979), cert. denied sub nom. Andrulis v. U. S., 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980). We must decide, therefore, whether such a waiver can be found in the express language of section 7701(g) or by "necessary implication from the statutory context in which (the) fee provision arises." Id. at 516-17.
 
 
 82
 1. Statutory language. As relevant, section 7701(g) provides:
 
 
 83
 (T)he Board, or an administrative law judge or other employee of the Board designated to hear a case, may require payment by the agency involved of reasonable attorney's fees incurred by an employee or applicant for employment if the employee or applicant for employment is the prevailing party and the Board, administrative law judge, or other employee, as the case may be, determines that payment by the agency is warranted in the interests of justice, including any case in which a prohibited personnel practice was engaged in by the agency or any case in which the agency's action was clearly without merit. (Emphasis added.)
 
 
 84
 The section is not expressly limited to appeals brought under Chapter 77. Indeed, it extends to "any case" and explicitly includes those, like the present one, that involve prohibited personnel practices.
 
 
 85
 The Board nevertheless relies on the emphasized phrases to argue that "the provision's language clearly presupposes the existence of ... an appeal." Brief for MSPB at 14. We find the Board's reading strained. First, the Board notes that the beginning of the section refers to the decisionmakers assigned by the Act to Chapter 77 appeals. See section 7701(b). Yet section 1205, on whose broad grant of procedural discretion the Board depends in another context, see p. 164 supra, specifically permits the Board to delegate the hearing of "all matters within (its) jurisdiction" to the same decisionmakers.
 
 
 86
 Second, the Board contends that the phrase "hear a case" limits the operation of the section to those proceedings in which the Act expressly provides for a hearing. This argument stands somewhat uncomfortably beside the Board's insistence that it had the power-perhaps even the duty-to conduct a hearing in this case. See p. 164 supra. In any event, the provision is not, by its terms restricted to cases which must include a formal hearing. Rather, the language easily covers any case the Board chooses to hear.
 
 
 87
 Third, the Board suggests that an employee can only be a "prevailing party" within the language of the section when he or she appeals as of right under Chapter 77. In this very case, however, the Board permitted the deputies, through their attorneys, "fully (to) participate in this proceeding as any other party." The Board thus implicitly recognized that intervenors can have the status of parties. The rights conferred by that status may include the right to request attorney's fees. Cf. United States v. Board of Education of Waterbury, Connecticut, 605 F.2d 573, 576 (2d Cir. 1979) (finding authority to award fees to district court intervenor).
 
 
 88
 Finally, the Board asserts that the last clause of the fee provision "which gives examples of when an award is 'warranted in the interest of justice,' refers to specified kinds of appeal cases, as the introductory word 'including' indicates." Answering Brief for MSPB at 3. While "including" certainly suggests an example, the phrase "any case" hardly seems restricted to appeals. The instant proceeding was manifestly a "case in which a prohibited personnel practice was engaged in by the agency," as the Board itself determined.
 
 
 89
 In short, we are unconvinced by the Board's effort to import unusual meaning into the words of the section. The phrases "hear a case" and "prevailing party" are not, as this case demonstrates, restricted in common usage to the type of action contemplated by Chapter 77. And the reference to "any case" involving prohibited practices plainly extends to all proceedings in which action is sought to identify and correct such practices. Read naturally, the language of the provision clearly waives sovereign immunity with respect to any case in which an employee or applicant for employment appears as a party.
 
 
 90
 2. Legislative intent. The Board suggests that, however broad the language of section 7701(g) may be, there are independent indications that Congress intended to limit the operation of the provision to Chapter 77 appeals. Specifically, the Board points to the fact that the fees provision is part of a section entitled "Appellate procedures" which in turn appears in Chapter 77. Furthermore, the Board notes, references to fees in the legislative history occasionally speak of appeals but never mention corrective action cases. For reasons just detailed, the Board's parsing of the section fails to disclose the kinds of linguistic ambiguities that require resort to interpretive aids like placement and history. We believe, nevertheless, that the Board's contentions reflect an unduly narrow understanding of the statutory scheme. Accordingly, we will discuss them briefly.
 
 
 91
 We may assume, from the section's placement and from various references in the legislative history to appeals, that Congress expected the fees provision to operate chiefly in the context of Chapter 77 actions. That fact alone, however, does not demonstrate that Congress intended to limit its waiver of immunity to such cases. At least two views of the legislative intent are plausible. Congress may, as the Board suggests, have assumed that the presence of the Special Counsel and the nature of corrective action proceedings make fee awards in such cases unnecessary or unwise. Alternatively, Congress may have allowed awards in all cases in which employees participate as parties. In that case, references in the history to appeals may simply reflect the fact that the possibility of such participation in corrective action proceedings was not immediately apparent to Congress.
 
 
 92
 We believe the latter hypothesis is more consistent with the available evidence. The purpose of the fees provision was set forth in the Senate Report at length:
 
 
 93
 The Civil Service Commission currently does not have the authority to require agencies to pay the attorney fees of employees who prevail in their appeals. Employees whose agencies have taken unfounded actions against them may spend a considerable amount of money defending themselves against these actions (yet) they cannot be reimbursed for attorney fees upon prevailing in their appeals to the Commission. Instead, they must file civil actions against the Government in order to obtain a review of their requests for reimbursement.
 
 
 94
 The legislation remedies this problem by authorizing the Board members and hearing officials to require payment, by agencies which are losing parties to proceedings before the Board, of attorney fees to the employees who prevailed....[66]
 
 
 95
 As expressed in this passage, the policy underlying the fees provision, while stated with reference to appeals, seems applicable to any proceeding in which an aggrieved employee seeks to vindicate rights conferred by the Act. As the Board may have recognized when it allowed the deputies to appear through their own lawyers, an employee can have a strong interest in challenging "agencies (that) have taken unfounded actions against them" even when those actions can only be remedied through a corrective action petition. Nor is that interest necessarily protected by the Special Counsel, whose efforts to assure a properly managed civil service may conflict with the goals of individual employees. See pp. 162 to 163 supra. Indeed, given the negotiating process that precedes the filing of a petition, the Special Counsel may commonly take a position before the Board that is somewhere between that of the employer and the employee.
 
 
 96
 Thus, it seems doubtful that Congress concluded that separate representation, and thereby fee authority, would be unnecessary in corrective action proceedings. Instead, Congress seems to have conferred authority to award fees in all cases in which employees appear as parties and permitted the Board to decide whether such appearances and fees were appropriate in corrective action proceedings. As noted earlier, p. 155 supra, corrective action petitions, unlike appeals, did not exist prior to the enactment of the CSRA. Congress was quite familiar with the experience of the Civil Service Commission in treating appeals and, in an effort to improve that process, elaborated the procedures governing such cases in considerable detail. In contrast, the initial shaping of corrective action procedures was left to the Board; Congress authorized the proceeding in a few open-ended sentences. Those sentences gave the Board the discretion, which it exercised in this case, to employ many of the procedures associated with appeals and to conclude that the interests of the employees involved justified independent representation. See p. 157 supra. We are confident that that flexibility is also broad enough to permit the Board to create a proceeding which by its nature would be within the intent of the waiver of sovereign immunity.
 
 
 97
 In sum, we hold the Board erred in determining that it lacked authority to assess attorney's fees in favor of the successful deputy. The language of section 7701(g) of the Act plainly waives sovereign immunity in any case in which an employee or applicant for employment appears as a party. Moreover, while the placement and history of the provision indicate that Congress did not expect fees questions to arise in corrective action proceedings, the intent of section 7701(g) together with the statutory scheme clearly give the Board the flexibility to award fees in appropriate corrective action cases. By permitting the deputies to appear through their own lawyers, the Board raised the possibility that this was such a case.
 
 
 98
 Our conclusion does not, of course, require the Board to award fees to petitioner Frazier. The Board must decide, in the first instance, whether the role employees play in the kind of proceeding it has established here implicates the policy underlying the fees provision. If so, the Board should consider whether Frazier can be called a "prevailing party" in light of his victory on the EEO wing of the case and whether "payment by the agency is warranted in the interest of justice." In examining the value of employee participation in corrective action proceedings, both in general and in the particular case, the Board may take into account the presence and role of the Special Counsel. We decide only that Congress has granted the Board power to award fees in all cases within its jurisdiction in which complaining employees appear as parties.
 
 IV. CONCLUSION
 
 99
 For the foregoing reasons, No. 80-1067 is dismissed as moot with respect to Frazier and affirmed as to the other three deputies. No. 80-1986 is remanded for proceedings not inconsistent with this opinion.
 
 
 100
 So ordered.
 
 
 
 [1]
 The history of civil service reform is detailed in the Senate debates that led to passage of the CSRA. See 124 Cong.Rec. S14267 (daily ed. Aug. 24, 1978) (statement of Sen. Ribicoff); id. at S14271-77 (statement of Sen. Stevens); id. at S14277-9 (statement of Sen. Sasser). These remarks are reprinted in II House Committee on Post Office and Civil Service, 9th Cong., 1st Sess., Legislative History of the Civil Service Reform Act of 1978, at 1606, 1614-30 (1979) (hereinafter "Legislative History")
 
 
 [2]
 See, e.g., S.Rep.No.969, 95th Cong., 2d Sess. 3 (1978), U.S.Code Cong. & Admin.News 1978, p. 2723 (hereinafter "Senate Report"), reprinted in II Legislative History at 1467. See also Note, 26 Wayne L.Rev. 97, 113-14 (1979)
 
 
 [3]
 See, e.g., Senate Report at 8, reprinted in II Legislative History at 1472; 124 Cong.Rec. S14303 (daily ed. Aug. 24, 1978) (statement of Sen. Metzenbaum); id. at S14304 (statement of Sen. Dole)
 
 
 [4]
 See, e.g., Senate Report at 5, reprinted in II Legislative History at 1469
 
 
 [5]
 President Carter's message appears in H.R.Rep.No.1403, 95th Cong., 2d Sess. 2-3 (1978) (hereinafter "House Report"), reprinted in I Legislative History at 639-40
 
 
 [6]
 124 Cong.Rec. S14267 (daily ed. Aug. 24, 1978) (statement of Sen. Ribicoff), reprinted in II Legislative History at 1607
 
 
 [7]
 The CSRA is codified in Title 5 of the United States Code. Unless otherwise noted, all section references in this opinion are to 5 U.S.C. (Supp. III 1979)
 
 
 [8]
 The Board's authority to hear employee appeals is detailed in Chapter 77 of the CSRA which is codified at 5 U.S.C. §§ 7701-03 (Supp. III 1979)
 
 
 [9]
 The significance of the phrase "adverse actions" was explained in Atwell v. Merit Systems Protection Board, 670 F.2d 272 at 280 n.11 (D.C.Cir.1981):
 Under the pre-CSRA civil service laws, appealable actions were known as "adverse actions," see 5 U.S.C. § 7511(2) (1976) (repealed), and that phrase became a term of legal art used both by practitioners in the field and by federal employees. Under the CSRA regimen, however, the phrase "adverse actions" is no longer employed as a definitional term; rather, the corresponding provision, 5 U.S.C. § 7512 (Supp. III 1979), refers in its section heading to "(a)ctions covered," and only in the chapter heading is the phrase "adverse actions" used. See Chapter 75, title 5, United States Code (Supp. III 1979).
 There is no suggestion in the legislative history that the Congress, in eschewing the use of "adverse actions" as a definitional term, intended substantive change, and we perceive none in the employment of the new language.
 See also Note, supra note 2, at 103-05. Whether the CSRA conferred a right to appeal actions not previously challengeable is, of course, a question not presented by this case.
 
 
 [10]
 See note 9 supra. The Board has promulgated regulations making appealable certain personnel actions not mentioned in the Act. See, e.g., 5 C.F.R. § 315.806 (1980) (termination of probationary employee in particular circumstances)
 
 
 [11]
 Should the Special Counsel conclude that there exists a "substantial likelihood" that the claims of agency wrongdoing are valid, he or she may order the agency concerned to conduct an investigation and issue a report. Section 1206(b)(3)(A). The report, which is to be submitted to the Congress, the President and, when appropriate, the Justice Department, must include "a description of any corrective action taken or planned as a result of the investigation." Sections 1206(b)(4)(E) & (b)(5)(A). On receipt of the report, the Special Counsel is required to determine if its findings "appear reasonable" and to transmit it to the complaining employee. Sections 1206(b) (5)(A) & (b)(6)
 
 
 [12]
 The Board's opinions regarding the various requests for stay appear under the heading of In re Frazier and are published at 1 MSPB 2 & 64 (1979)
 
 
 [13]
 The Board's opinion on the merits appears as In re Frazier, 1 MSPB 159 (1979)
 
 
 [14]
 1 MSBP at 163
 
 
 [15]
 Id. at 165
 
 
 [16]
 Id. at 166
 
 
 [17]
 Id. at 174
 
 
 [18]
 The team was also critical of the management staff in Atlanta and recommended the transfer of the Chief Deputy and one of the supervisory deputies. Id. at 175
 
 
 [19]
 Id. at 179-80
 
 
 [20]
 Id. at 179
 
 
 [21]
 Id. at 180-83
 
 
 [22]
 Id. at 181
 
 
 [23]
 Id. at 182
 
 
 [24]
 Id. at 186
 
 
 [25]
 Id. at 189
 
 
 [26]
 Id. at 187
 
 
 [27]
 Id. at 187-88
 
 
 [28]
 Section 7703 provides, in relevant part:
 (a)(1) Any employee or applicant for employment adversely affected or aggrieved by a final order or decision of the Merit Systems Protection Board may obtain judicial review of the order or decision.
 (b)(1) Except as provided in paragraph (2) of this subsection (dealing with discrimination cases), a petition to review a final order or final decision of the Board shall be filed in the Court of Claims or a United States court of appeals as provided in chapters 91 and 158, respectively, of title 28....
 Chapter 158 of title 28 includes 28 U.S.C. § 2342 (Supp. III 1979) which was amended by the CSRA. The section provides:
 The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of-
 (6) all final orders of the Merit Systems Protection Board except as provided for in section 7703(b) of title 5 (which includes subsection (2) dealing with discrimination cases).
 
 
 [29]
 Intervenors note that all four deputies have departed from the Marshals Service, see p. 160 infra, and therefore no longer possess the status of "employees" or "applicants for employment" as required by section 7703. Intervenors acknowledge that discharged employees retain a right to contest a removal even after it has taken effect. They claim, however, that petitioners voluntarily resigned from the Service and therefore freely relinquished their "employee" status. Petitioners strenuously deny that they left voluntarily. Instead, they allege that the transfers, put into final effect by the Board's decision, see In re Frazier, 1 MSPB 268 (1979) (denying petition for stay pending appeal to this court), forced them to resign to avoid an intolerable disruption of their lives and working conditions. They thus contend that they were constructively discharged as a result of the Board's decision. Cf. Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977)
 We are not, of course, competent to determine the ultimate validity of petitioners' constructive discharge claims in the present posture of the case. We note, however, that an illegal reassignment, if it produces sufficient hardship and causes an unwilling resignation, can support such a claim. See Roskos v. United States, 549 F.2d 1386 (Ct. Claims 1977) (improper or arbitrary transfer that would be hazardous to employee's health and hardship to his family represented coercive government action that directly produced resignation). In this case, petitioners, while still employees, argued that their transfers would be unlawful and would create undue hardships. The Board rejected these contentions, forcing the employees to choose between allegedly intolerable employment conditions and resignation. As in a conventional removal case, then, we are faced with a situation in which individuals contend that they are no longer employees precisely because of the decision they are challenging. Under these circumstances, we believe petitioners fall within the ambit of section 7703.
 
 
 [30]
 "Adversely affected" for purposes of judicial review has no necessary relationship to "adverse actions" for purposes of bringing appeals to the Board. The latter phrase concerns an individual's right to attack personnel actions through the mechanism of a Chapter 77 appeal. See note 9 supra. In contrast, "adversely affected," like similar standards used in other statutory review provisions, concerns the complainant's legal interest in challenging final orders of the Board. See Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief, 83 Yale L.J. 425, 429-32 & nn.11-12 (1974). The determination of interest sufficient to pursue an appeal is separate from consideration of the complainant's right to intervene in the proceedings below. See Bryant v. Yellen, 447 U.S. 352, 366-67, 100 S.Ct. 2232, 2240-41, 65 L.Ed.2d 184 (1980); Linda R. S. v. Richard D., 410 U.S. 614, 616-19, 93 S.Ct. 1146, 1148-49, 35 L.Ed.2d 536 (1973). See also Princeton University & New Jersey v. Schmid, --- U.S. ----, ----, 102 S.Ct. 867, 868, 70 L.Ed.2d 855, 1982) (suggesting that a party granted leave to intervene in a criminal proceeding could possess an appealable interest in the outcome). This case does not, therefore, require us to determine whether a civil servant may demand intervention in a corrective action case that could affect his or her employment status
 Like other statutory review provisions, section 7703 invites an inquiry into the nature of complainant's alleged injury and the relationship of the injury to the purpose of the statute in question. See, e.g., U. S. v. Storer Broadcasting Co., 351 U.S. 192, 198-200, 76 S.Ct. 763, 768-769, 100 L.Ed. 1081 (1956); Columbia Broadcasting System, Inc. v. U. S., 316 U.S. 407, 422-25, 62 S.Ct. 1194, 1202-04, 86 L.Ed. 1563 (1942); Straus Communications, Inc. v. FCC, 530 F.2d 1001, 1006-07 (D.C.Cir.1976). In the absence of a specific review provision like section 7703, standing requirements may be even stricter. See Wash. Utilities & Transp. Comm'n v. FCC, 513 F.2d 1142, 1149 n.8 (9th Cir.), cert. denied sub nom. N.A.R.U.C. v. FCC, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975). Without such a provision, the complainant must show that "the challenged action has caused him injury in fact, economic or otherwise" and that the interest he seeks to protect falls "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Ass'n of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 152-53, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). In this case, petitioners Morris, Reilly, and Love easily satisfy even the arguably stricter Data Processing test. They have each alleged concrete and substantial injury from the Board's decision. See p. ---- infra. Moreover, their interest in retaining federal employment free from unlawful reprisals is clearly one within the "zone of interests to be protected" by the CSRA. See pp. 153 to 154 supra.
 
 
 [31]
 Senate Report, at 62, reprinted in II Legislative History at 1526. The House version of the judicial review provision was identical to that of the Senate except that the former lodged jurisdiction over petitions to review Board orders in the district courts rather than in the courts of appeal. In conference, the Senate version was adopted, "incorporating the traditional appellate mechanism for reviewing final decisions and orders of Federal administrative agencies." H.R.Rep.No.1717, 95th Cong., 2d Sess. 143 (1978), U.S.Code Cong. & Admin.News 1978, p. 2876 ("Conference Report"), reprinted in II Legislative History at 143
 
 
 [32]
 Senate Report, at 62, reprinted in II Legislative History at 1526
 
 
 [33]
 The Board's decision was announced on December 17, 1979. According to an affidavit executed by Kenneth C. Holecko, Acting Personnel Officer for the Marshals Service, Deputy Morris voluntarily resigned on December 3, 1979 while the case was under submission to the Board. Holecko's affidavit also states that Love and Reilly voluntarily resigned on January 2 and February 9, 1980, respectively. Finally, the affidavit states that Frazier did not report for duty from November 9, 1979 (after the Board had heard evidence and received the final pleadings but before it rendered its decision) until May 31, 1980, when he was removed from the Service for having abandoned his position. See Brief for Respondents in No. 80-1067, Appendix B
 
 
 [34]
 See In re Frazier, 1 MSPB 193 (1979) (order of corrective action). The vitality of Frazier's collateral request for attorney's fees is not, of course, affected by the mootness of his challenge to the Board's procedures
 
 
 [35]
 For example, the Review Team reported:
 The majority of all employees appear to be reasonably satisfied with the working conditions in the district.... However, a majority of the employees and all of management feels that a small group of employees is bent on disrupting the district and has allowed personal feelings to override what may have once been objective concerns....
 There are four (4) employees who are totally alienated and distrustful of district management. They have become so embittered that they can no longer present rational arguments to support their concerns. The intensity and pervasiveness of their negatives (sic) would appear to make any attempts at remediation or reconciliation ineffective.
 I J.A. 73.
 We assume that the records supporting Frazier's transfer, insofar as they may affect his employability, were expunged or at least superceded by virtue of the Board's conclusion that the personnel actions taken against him were unjustified.
 
 
 [36]
 While concluding that "the alienation of the four deputies was attributable in part to bad management" and noting that they "have excellent potential," the Board found that the "deputies were hostile, frustrated, disruptive and demonstrably unable to function effectively in Atlanta." 1 MSPB at 183
 
 
 [37]
 See Dabney v. Freeman, 358 F.2d 533 (D.C.Cir.1965); Paroczay v. Hodges, 297 F.2d 439 (D.C.Cir.1961); Christie v. U. S., 518 F.2d 584 (Ct.Cl.1975); Myslik v. Veteran's Administration, 2 MSPB 241 (1980)
 
 
 [38]
 Petitioners' constructive discharge claims turn, to a significant degree, on the propriety of the transfers. See notes 29 & 37 supra. Here, the Board has determined that the reassignments were lawful and justified. We do not know what effect the Board might give these findings in any subsequent action brought by the deputies to remedy the alleged discharges. We intimate no view on whether the Board could deem the findings conclusive in any future proceedings. The possibility that the Board's decision will have a substantial effect on any such proceedings is, however, a sufficient basis for concluding that the case is not moot. See Sun Oil Co. of Penn. v. NLRB, 576 F.2d 553, 558 n.3 (3d Cir. 1978)
 
 
 [39]
 In the respects noted, this case bears some similarity to Beller v. Middendorf, 632 F.2d 788 (9th Cir. 1980), cert. denied sub nom. Beller v. Lehman, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 & Miller v. Weinberger, --- U.S. ----, 102 S.Ct. 304, 70 L.Ed.2d 150 (1981), in which plaintiffs challenged their discharges from the Navy. The removals had been based on claims that the plaintiffs had engaged in prohibited homosexual acts. The Navy argued that the expiration of the enlistment terms of the plaintiffs coupled with the court's inability to order their reinstatement rendered the case moot. In rejecting this argument, the court noted that plaintiffs might be able to bring damage claims, that they alleged being subjected to a continuing stigma from the Navy's decision, and that "the discharge and accompanying materials in their personnel records may injure their employment prospects." Id. at 800
 
 
 [40]
 Power Reactor Development Co. v. Int'l Union of Elec., Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), quoting Norwegian Nitrogen Products Co. v. U. S., 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933)
 
 
 [41]
 We express no view on whether employees have a right to challenge the Special Counsel's decision not to bring a corrective action petition or to settle a case with the agency involved. Cf. George Banta Co., Inc. v. NLRB, 626 F.2d 354 (4th Cir. 1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 803 (1981); Pacific Southwest Airlines v. NLRB, 611 F.2d 1309 (9th Cir. 1980); Associated Builders & Contractors, Inc., Balt. Chapter v. Irving, 610 F.2d 1221 (4th Cir. 1979), cert. denied, sub nom. Assoc. Builders v. Lubbers, 446 U.S. 965, 100 S.Ct. 2941, 64 L.Ed.2d 823 (1980) (all holding decision of NLRB General Counsel not to bring unfair labor practice complaint unreviewable). But see Int'l Union, United Automobile, Aerospace & Agriculture Implement Workers of America v. Scofield, 382 U.S. 205, 210, 86 S.Ct. 373, 377, 15 L.Ed.2d 272 (1965) (as to dismissed complaint, charging party is "person aggrieved" for purposes of appeal); Leeds & Northrup Co. v. NLRB, 357 F.2d 527, 536 (3d Cir. 1966) (charging party has right to a hearing on objections to settlement between Board and charged party); Retail Clerks Union 1059, Retail Clerks Int'l Ass'n v. NLRB, 348 F.2d 369, 370 (D.C.Cir.1965) (same)
 
 
 [42]
 The Special Counsel may, for example, seek disciplinary action against individual employees by bringing a complaint to the Board. Section 1206(g). See also section 1207 ("(h)earings and decisions on complaints filed by the Special Counsel")
 
 
 [43]
 See Civil Service Reform: Hearings on H.R. 11280 Before the House Comm. on Post Office and Civil Service, 95th Cong., 2d Sess. 820 (1978) (Memorandum, Office of Legal Counsel, U.S. Dept. of Justice, Civil Service Commission Reform: Role of the Special Counsel) ("This statutory scheme is modeled on the statute providing for the General Counsel of the National Labor Relations Board, 29 U.S.C. sec. 153(d).")
 
 
 [44]
 See, e.g., House Report at 100, reprinted in I Legislative History at 737; 124 Cong.Rec. S14268 (daily ed. Aug. 24, 1978) (statement of Sen. Ribicoff) (exhibit one)
 
 
 [45]
 Section 1206(i) grants the Special Counsel the right to "intervene or otherwise participate in any proceeding before the Merit Systems Protection Board...."
 Reassignments are not among the personnel actions explicitly made appealable to the Board by statute or regulation.
 
 
 [46]
 See page 165 infra. See also section 7701(f) (permitting the Board to consolidate appeals if that would allow cases to be "processed more expeditiously and would not adversely affect any party"). In the event of such a merger, the Board could not, of course deprive an employee of the procedural safeguards to which he or she would be entitled under Chapter 77
 
 
 [47]
 Senate Report, at 32, U.S.Code Cong. & Admin.News 1978, p. 2754, reprinted in II Legislative History at 1496
 
 
 [48]
 Section 1205(a)(1) provides:
 (a) The Merit Systems Protection Board shall-
 (1) hear, adjudicate, or provide for the hearing or adjudication, of all matters with the jurisdiction of the Board under this title, section 2023 of title 38, or any other law, rule, or regulation, and, subject to otherwise applicable provisions of law, take final action on any such matter....
 
 
 [49]
 See, e.g., 42 U.S.C. §§ 2000a-5 & 2000e-6 (authorizing Attorney General to bring civil action when he or she has "reasonable cause to believe" a pattern or practice of discrimination exists); 7 U.S.C. § 2305(b) (permitting Secretary of Agriculture to request that Attorney General bring civil action when Secretary has "reasonable cause to believe" that there has been a violation of section 2303); 42 U.S.C. § 2824(d) (instructing Director of Community Services Administration to hold hearing when he or she has "reasonable cause to believe" that state agencies are violating the law)
 
 
 [50]
 See, e.g., House Report at 100, reprinted in I Legislative History at 737; Senate Report at 6, 24, reprinted in II Legislative History at 1470, 1488; Conference Report at 133, reprinted in II Legislative History at 1975
 
 
 [51]
 Another indication that Congress intended the Board to evaluate the Special Counsel's determinations is found in the history of the provision granting the Special Counsel authority to seek stays of personnel actions. The Senate version required the Special Counsel to petition the Board for a stay while the House version allowed the Special Counsel to order a stay for up to 30 days without consultation with the Board. In conference, the Senate's approach was adopted because of a belief that "the Board, as a quasi-judicial body, is the appropriate authority to issue the stay." Conference Report at 133, U.S.Code Cong & Admin.News 1978, p. 2866, reprinted in II Legislative History at 1975. Both the Senate and the conference reports instructed the Board to give "great weight" to the Special Counsel's findings in support of stay. Senate Report at 30, reprinted in II Legislative History at 1975. Clearly, then, the Special Counsel's determinations were not meant to bind the Board
 
 
 [52]
 Compare section 1207. See note 42 supra
 
 
 [53]
 Paragraph (1) of section 7701(c) requires the Board to sustain agency actions "only if" they are supported by substantial evidence in some cases and the preponderance of the evidence in others. Paragraph (2), however, provides:
 Notwithstanding paragraph (1), the agency's decision may not be sustained ... if the employee or applicant for employment-
 (B) shows that the decision was based on any prohibited personnel practice....
 (Emphasis added.)
 
 
 [54]
 As the Board noted:
 The protection of whistleblowers is a primary purpose of the Act. At the same time, the restrictions on managerial abuses and protection of employees established by Title I must be construed in light of the Act's legislative history, which reveals a complementary, but some(e)times countervailing, purpose to improve the efficiency of the civil service by facilitating removal of the employees who fail to perform their duties. Thus an employee's claim to be a whistleblower must be carefully scrutinized to insure that whistleblowing protection is not being misused in an attempt to thwart needed disciplinary action.
 
 
 [1]
 MSPB at 159 n.1. The Board's comments are supported by the legislative history of the Act. See, e.g., Senate Report at 8, reprinted in II Legislative History at 1472; 124 Cong.Rec. S14304 (daily ed. Aug. 24, 1978) (statement of Sen. Dole)
 
 
 [55]
 Mt. Healthy also establishes that once the employee has met this initial burden, the employer can attempt to prove that the same action would have been taken regardless of the protected activities, 429 U.S. at 287, 97 S.Ct. at 576. The Board found it unnecessary to shift the burden to the Marshals Service since, except as to Frazier, it concluded that the Special Counsel had failed to prove that protected activities caused the transfers. See pp. 166 to 167 infra
 
 
 [56]
 In considering whether petitioners' EEO activities led to their transfers, the Board noted that retaliatory motive could be inferred. 1 MSPB at 186. Indeed, the Board's conclusion that Frazier's transfer was improper was based on its decision to attribute knowledge of the deputy's EEO activities to Director Hall. See page 158 supra. Petitioners do not challenge the Board's treatment of the EEO aspect of the case
 
 
 [57]
 Senate Report at 23, U.S.Code Cong. & Admin.News 1978, p. 2745, reprinted in II Legislative History at 1487
 
 
 [58]
 Id
 
 
 [59]
 1 MSPB at 181
 
 
 [60]
 Id. at 181-82
 
 
 [61]
 Id. at 182
 
 
 [62]
 Id
 The Special Counsel did not contend that, even if the team members were unaware of the whistleblowing, their report was fatally infected by any biased testimony from individuals who knew of the deputies' disclosures. The Board found that the team's report was reasonably based on discussions with all members of the Atlanta staff, that it did not wholly accept the contentions of any party, and that it reflected sound management considerations. See 1 MSPB at 174-75 & 183. We see no reason to disturb these findings. Accordingly, we need not determine to what extent, if any, the Act prohibits personnel actions unwittingly based on evidence tainted by the retaliatory motives of non-decisionmakers.
 
 
 [63]
 Id. at 182-83
 
 
 [64]
 The Board found that Vandergrift "never discussed the inquiry from Fowler's office with Hall or any member of the (review) team." Id. at 181. As to Lora, the Board determined that the extent of his "communication to Hall regarding his trip to Atlanta was to tell Hall that he concurred in Marshal Angel's transfer recommendation." Id. Like Angel's recommendation itself, Lora's concurrence did not apparently persuade Hall who only decided to transfer some of the deputies mentioned by Hall after receipt of the Review Team's report. See p. 157 supra
 
 
 [65]
 Id. at 182-83
 
 
 [66]
 Senate Report at 60-61, U.S.Code Cong. & Admin.News 1978, pp. 2782-2783, reprinted in II Legislative History at 1524-25