Amalio M. PEREZ, Petitioner,

v.

ARMY AND AIR FORCE EXCHANGE
SERVICE and Merit Systems Protec-
tion Board, Respondents.

Mary A. WALTERS, Petitioner,

v.

DEPARTMENT OF THE NAVY and
Merit Systems Protection Board,
Respondents.

Nos. 80–2472, 81–1080.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 16, 1981.

Decided June 4, 1982.

As amended June 4, 1982.

Charles A. Hobbie, Washington, D. C., with whom James R. Rosa, Washington, D. C., was on the brief, for petitioners.

Robert A. Reutershan, Atty., Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, Royce C. Lamberth, Kenneth M. Raisler and Scott T. Kragie, Asst. U. S. Attys., Washington, D. C., Irene Jackson, Asst. Gen. Counsel, Army and Air Force Exchange Service, and Marian H. Harris, Associate Chief Trial Atty., Dept. of the Navy, Washington, D. C., were on the brief, for respondents.

Jane M. Edmisten, Atty., Merit Systems Protection Board, Washington, D. C., entered an appearance and filed a statement in lieu of brief for respondent, Merit Systems Protection Bd.

Before WRIGHT and WILKEY, Circuit Judges, and McGOWAN, Senior Circuit Judge.

McGOWAN, Senior Circuit Judge:

Petitioners in these consolidated cases [1] appealed their job terminations to the Merit Systems Protection Board ("MSPB" or "Board"), and now challenge in this court the Board's determination that, by reason of petitioners' status as nonappropriated fund employees, it lacked jurisdiction under the Civil Service Reform Act of 1978 to hear those appeals. For the reasons hereinafter appearing, we find that the Board correctly understood its jurisdictional limits, and we affirm its dismissal of the appeals.

I.

A.

Petitioner Amalio M. Perez held a position as a salesclerk with the South Texas Area Exchange, Lackland Air Force Base, a local facility of the Army and Air Force Exchange Service ("AAFES"). The AAFES is a nonappropriated fund instrumentality of the United States, a term denoting an activity whose monies are not received by congressional appropriation,[2] and whose employees are paid primarily from income generated by the activity it-

---

1. *Perez v. Army and Air Force Exchange Service*, No. 80 2472; *Walters v. Department of the Navy*, No. 81 1080.

2. *See United States v. Hopkins*, 427 U.S. 123, 125 n.2, 96 S.Ct. 2508, 2510 n.2, 49 L.Ed.2d 361 (1976).

self.[3] Functions of the AAFES include providing merchandise and services to authorized patrons, and furnishing motion picture entertainment to military personnel at Army and Air Force installations. Employees of the AAFES are subject to regulations issued jointly by the Army and Air Force.[4]

By letter dated February 11, 1980, Perez learned that the AAFES proposed to "separate [him] for cause" following the passage of thirty days from Perez's receipt of the letter. Joint Appendix ("J.A.") 14. The letter gave as reasons for the action several incidents of Perez's insubordination, and informed him of his right to reply orally and in writing, as well as to enlist the assistance of a "representative" in making that reply, before the separation became final. In a letter dated February 20, 1980, Perez responded to the proposed action: he designated a representative, denied the charges of insubordination, and contended that the real motives for the action were racial discrimination and retaliation for Perez's exercise of his right to have union assistance in connection with an earlier conflict between him and his superiors. J.A. 8. After giving "[f]ull consideration" to this reply, J.A. 5, the AAFES sent a notice, dated March 4, 1980, telling Perez of his final separation, effective March 14, 1980. J.A. 5. The notice set forth the AAFES's conclusion that insubordination, and not racial discrimination, was the reason for the action. Also included in the notice was a description of the AAFES appeal procedure through which Perez could challenge the separation.[5]

Perez did not make use of this procedure; instead, he filed on April 4, 1980, an appeal to the MSPB. J.A. 1. On July 10, 1980, the MSPB issued an initial decision dismissing the appeal for want of jurisdiction. J.A. 72. Perez then petitioned the Board to undertake discretionary review of the decision, J.A. 76, but the Board, on November 4, 1980, denied the petition because it fell short of the standards for such review, J.A. 87.[6] As a consequence, the initial decision became the Board's final decision five days from the November 4 order. Perez then filed a petition for review in this court on December 4, 1980.

B.

Petitioner Mary Walters was employed as a customer services clerk with the Navy Exchange at the Naval Air Station in Patuxent River, Maryland. The Exchange is a local facility of the Navy Resale and Service Support Office ("NAVRESSO"), the parent organization of all Navy exchanges. The NAVRESSO and its constituent exchanges are nonappropriated fund entities. Walters received a letter dated April 1, 1980, apprising her that, due to unsatisfactory work performance, her job would be terminated following the passage of the required thirty-day notice period. The letter set forth specific allegations of inadequate performance and described her right to appeal the proposed action through NAVRESSO procedures before the issuance of any final decision.[7] J.A. 97. After Wal-

---

3. *National Federation of Federal Employees v. Brown*, 645 F.2d 1017, 1019 (D.C.Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 103, 70 L.Ed.2d 92 (1981).

4. Letter from the AAFES to the MSPB (April 25, 1980), Joint Appendix 34. A detailed description of the organization and operations of the AAFES appears in *Champaign-Urbana News Agency, Inc. v. J. L. Cummins News Co.*, 632 F.2d 680 (7th Cir. 1980) (as modified on denial of rehearing and rehearing en banc).

5. This procedure included the opportunity to make a statement, to request an evidentiary hearing, and to obtain the assistance of the personnel manager, private counsel, or another employee in preparing the appeal. J.A. 6–7.

6. The Board may grant a petition for review of an initial decision when the petition establishes either (1) the existence of new and material evidence that, despite due diligence, was unavailable at the time the record was closed, or (2) that the initial decision was based on an erroneous interpretation of a statute or regulation. 5 C.F.R. § 1201.114 (1982).

7. Under these procedures, Walters had the right to present her case at several different stages. She could submit a written reply to the Navy Exchange Officer, appeal that decision in writing to the Director of Navy Exchange, and then appeal the Director's decision to the Commandant of the Washington Naval District. She also had a right to one hearing, which she

ters made a verbal reply, the Exchange notified her that her termination would become effective May 1, 1980. J.A. 99. Walters appealed this decision on May 2 to the next level of NAVRESSO's internal review, J.A. 100; see note 7, and in addition filed an appeal with the MSPB on May 6, J.A. 101. In both appeals she pointed out that her removal had been accomplished in violation of NAVRESSO regulations, which, she claimed, required the Commanding Officer of the Naval Air Station to concur in the action taken against her. J.A. 100, 105. As a result of this procedural flaw,[8] the Exchange on May 12 reinstated her with backpay, but also informed her that the advance notice of termination was still in effect and that her removal would be forthcoming once the required concurrence had been obtained. J.A. 106. Apparently having received that concurrence, the Exchange, on May 13, terminated her employment and reminded her of the NAVRESSO appeal procedures. J.A. 107.

Walters once more took an appeal to the Exchange, alleging that the termination letter contained procedural defects, that she had been "deliberately programmed to fail" because her assigned duties were inconsistent with the stated requirements of her job, and that the Exchange could not validly remove her for poor performance without first instituting the agency-wide performance appraisal system said to be required under 5 U.S.C. § 4303 (Supp. III 1979). J.A. 114. These claims were rejected at the first level of NAVRESSO review, J.A. 124,[9]

and Walters then notified the Exchange of her intent to move to the next stage of appeal, J.A. 126. The record does not disclose the outcome of this or any further NAVRESSO appeal.

Before any decision had been rendered in her first-level NAVRESSO appeal, Walters also filed an appeal with the MSPB on May 19, 1980, essentially repeating the contentions pressed in her NAVRESSO appeal. J.A. 108. The MSPB issued an initial decision on September 4, 1980, dismissing the appeal for lack of jurisdiction. J.A. 131. Walters petitioned the Board to review the decision, but on January 5, 1981, the Board held that the petition did not meet the criteria for discretionary review and therefore denied the petition. J.A. 147. As a result, the initial decision became final five days from the January 5 order. Walters then sought our review by a petition filed January 23, 1981.

## II.

The disagreement between petitioners and the Board results from their differing interpretations of how the Civil Service Reform Act of 1978 ("CSRA" or "Act"), Pub. L.No.95–454, 92 Stat. 1111 (codified in 5 U.S.C. (Supp. III 1979)), affected the appeal rights of nonappropriated fund personnel. Under pre-CSRA law, such personnel were defined as non-"employees" for the purpose of laws, other than specified exceptions, that were "administered by the Civil Service Commission." 5 U.S.C. § 2105(c) (1976).[10] At that time, the laws "adminis-

---

could elect to exercise at any of these three stages. A last written appeal could then be taken to the Commander of NAVRESSO, whose decision would be final. J.A. 120–21.

**8.** Walters correctly discerned the absence of the required concurrence, but she incorrectly identified the official from whom the concurrence had to be obtained. The Exchange's response pointed out her error, but also conceded its own. J.A. 106.

**9.** The first stage of review consisted of a written appeal to, and possibly a hearing before, the Navy Exchange Officer. See note 7 supra. Walters was granted an extension of time in which to present her appeal at this level. J.A. 124.

**10.** Prior to the CSRA, section 2105(c) read as follows:

(c) An employee paid from nonappropriated funds of the Army and Air Force Exchange Service, Army and Air Force Motion Picture Service, Navy Ship's Stores Ashore, Navy exchanges, Marine Corps exchanges, Coast Guard exchanges, and other instrumentalities of the United States under the jurisdiction of the armed forces conducted for the comfort, pleasure, contentment, and mental and physical improvement of personnel of the armed forces is deemed not an employee for the purpose of—

(1) laws (other than subchapter IV of chapter 53 and sections 5550 and 7154 of this

tered" by the Civil Service Commission ("CSC") included the provisions governing "adverse actions"[11] as well as those concerning appeals taken from such actions.[12] No argument could be made, therefore, that nonappropriated fund personnel had a right to appeal job removals to the CSC.[13]

The CSRA amended section 2105(c), however, replacing "administered by the Civil Service Commission" with "administered by the Office of Personnel Management."[14]

Because this amendment is a central component of all petitioners' arguments, we should relate some essential background to it before describing those arguments.

■ The amendment, which appears in the Act as a "technical and conforming" amendment, Pub.L.No.95–454, § 906(a)(2), 92 Stat. 1224, reflects the Act's abolition of the CSC and its replacement of that body with two new agencies, the MSPB and the Office of Personnel Management ("OPM").

title) administered by the Civil Service Commission; or
   (2) subchapter I of chapter 81 and section 7902 of this title.
This subsection does not affect the status of these nonappropriated fund activities as Federal instrumentalities.
The section was a recodified version of 5 U.S.C. § 150k, enacted in 1952. Act of June 19, 1952, ch. 444, § 1, 66 Stat. 138. The reports of both Houses of Congress make clear that the purpose of the provision was to place beyond doubt a proposition that had been long assumed but that had been made somewhat uncertain by the Supreme Court's decision in *Standard Oil Co. v. Johnson*, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1952). *See* S.Rep. No.1341, 82d Cong., 2d Sess. 1–2 (1952); H.R. Rep.No.1995, 82d Cong., 2d Sess. 1–2 (1952). In the words of the House Report:

While [*Standard Oil Co.*] did not specifically relate to the question of the status of employees of these exchange activities, a doubt has been raised as to whether or not the various civil-service laws and regulations administered by the Civil Service Commission are applicable to civilian exchange employees. In the past they have not been considered Federal employees for such purposes. However, to avoid any legal complications in the future with respect to the status of these employees, it is the view of the committee that this action be taken to clarify the status of these employees.
*Id.* at 2.

**11.** The phrase "adverse actions" was defined to include job removals. 5 U.S.C. § 7511(2) (1976) (repealed). As we explained in *Atwell v. Merit Systems Protection Board*, 670 F.2d 272, 280 n.11 (D.C.Cir.1981):

Under the pre-CSRA civil service laws, appealable actions were known as "adverse actions," *see* 5 U.S.C. § 7511(2) (1976) (repealed), and that phrase became a term of legal art used both by practitioners in the field and by federal employees. Under the CSRA regimen, however, the phrase "adverse actions" is no longer employed as a definitional term; rather, the corresponding provision, 5 U.S.C. § 7512 (Supp. III 1979),

refers in its section heading to "[a]ctions covered," and only in the chapter heading is the phrase "adverse actions" used. *See* Chapter 75, title 5, United States Code (Supp. III 1979).
There is no suggestion in the legislative history that the Congress, in eschewing the use of "adverse actions" as a definitional term, intended substantive change, and we perceive none in the employment of the new language.

**12.** Before the passage of the CSRA, the Chairman of the CSC, or an employee designated by the Chairman, was entrusted with the function of "executing, administering, and enforcing the civil service rules and regulations of the President and the Commission and the statutes governing the same . . . ." 5 U.S.C. § 1104(a)(5)(A) (1976) (repealed). Falling within this broad authority were the laws respecting adverse actions, *id.* §§ 7501–7533 (repealed), and the provisions relating to appeals taken to the CSC, *id.* § 7701 (repealed); Executive Order No. 10988, 27 Fed.Reg. 551 (1962). An account of the pre-CSRA appeal system can be found in Berzak, Rights Accorded Federal Employees Against Whom Adverse Personnel Actions Are Taken, 47 Notre Dame Law. 853 (1972).

**13.** As the Board has stated, "Prior to the passage of the Act, the appellate decisions of the Board's predecessor agency, the United States Civil Service Commission, consistently held that [nonappropriated fund] employees were excluded by the provisions of 5 U.S.C. 2105 from the Commission's appellate authority." *Taylor v. Department of the Navy*, 2 M.S.P.B. 6, 7 (1980), *reprinted at* J.A. 90, 91, *discussed at* page 784 *infra*.

**14.** The CSRA also substituted section number "7204" for "7154." Pub.L.No.95–454, § 703(c)(2), 92 Stat. 1217. *See* 5 U.S.C. § 2105 note (Supp. III 1979) (explaining the inadvertent reversal of sections 703(c)(1) and 703(c)(2) of the Act). These two amendments represent the only changes wrought in section 2105(c) by the CSRA.

A central purpose of this bifurcation was "to insure that those who are responsible for administering the civil service system will not have the primary responsibility of determining whether that system is free from abuse." S.Rep.No.95–969, 95th Cong., 2d Sess. 24 (1978), *reprinted in* II House Committee on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Civil Service Reform Act of 1978, at 1461, 1488 (1979) [hereinafter cited as Legislative History], U.S.Code Cong. & Admin. News 1978, p. 2723.

In accord with this aim, the Act transferred to the OPM the CSC's responsibility as the central personnel administrator of the civil service system. 5 U.S.C. § 1103 (Supp. III 1979); H.R.Rep.No.95–1403, 95th Cong., 2d Sess. 4, 6 (1978), *reprinted in* I Legislative History at 636, 641, 643; S.Rep.No.95–969, *supra*, at 24, *reprinted in* II Legislative History at 1488, U.S.Code Cong. & Admin. News 1978, p. 2746. The MSPB inherited the appellate authority that had been vested in the CSC. 5 U.S.C. § 1205(a)(1) (Supp. III 1979); *see* H.R.Rep.No.95–1403, *supra*, at 6, *reprinted in* I Legislative History at 643. Because the Act effected changes in the types of actions over which the MSPB has jurisdiction, the MSPB's jurisdiction differs in many respects from that once exercised by the CSC.[15]

As a result of the amendment to section 2105(c), petitioners argue, the exclusion of nonappropriated fund personnel from "employee" status is not operative with respect to appeals taken to the MSPB, because the MSPB, and not the OPM, is said to "administer" the laws governing the appellate process. In the absence of an express exception, petitioners continue, they may avail themselves of the rights of appeal granted under various provisions of the CSRA.

In both of the decisions on review, the MSPB rejected these arguments on the authority of its earlier decision in *Taylor v. Department of the Navy*, 2 M.S.P.B. 6 (1980), *reprinted at* J.A. 90.[16] Like petitioners, Taylor was a nonappropriated fund employee who sought MSPB review of her job termination, presenting arguments based on the CSRA, particularly the amendment to section 2105(c). Because the *Taylor* decision represents the Board's answer to the arguments advanced by petitioners in the instant cases, we preface our analysis by recounting that answer.

Beginning with the observation that under pre-CSRA law nonappropriated fund personnel could not appeal personnel actions to the CSC, 2 M.S.P.B. at 7, J.A. 91, the Board in *Taylor* found that no provision of the CSRA either expressly or impliedly altered that proscription so as to allow the MSPB to entertain such appeals. Its jurisdiction over employee-initiated appeals is limited, emphasized the Board, to actions appealable under some law, rule, or regulation, and no section of the Act authorizes the Board to extend its jurisdiction beyond those limits. 2 M.S.P.B. at 7–8, J.A. 92. After inspecting the various provisions arguably bearing on the appeal rights of a nonappropriated fund worker, the Board concluded that none rendered appealable a personnel action taken against such an employee.

### III.

■ Our review of the MSPB's dismissals must follow the standard set forth in 5 U.S.C. § 7703(c)(1) (Supp. III 1979): " . . .

15. An example of such a change is the Act's creation of an independent Special Counsel within the MSPB with authority to investigate, and then to request the Board to consider, charges of "prohibited personnel practices," a category of actions newly proscribed in the Act. 5 U.S.C. §§ 1204, 1206 (Supp. III 1979).

16. The initial decision dismissing Perez's appeal relied specifically on *Taylor*, J.A. 73–74, and the Board's order denying review of the initial decision set forth no additional rationale, J.A. 87. *Taylor* was again cited in the initial decision dismissing Walter's appeal, J.A. 131, but the initial decision also made mention of the rationale that nonappropriated fund personnel are not employees of the United States, *id.*, a proposition rejected by the Supreme Court, *United States v. Hopkins*, 427 U.S. 123, 128, 96 S.Ct. 2508, 2511, 49 L.Ed.2d 361 (1976). In its order denying review of this initial decision, the Board clarified that the dismissal rested solely on the authority of *Taylor*. J.A. 147.

[T]he court shall review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...." [17] Although in the course of this examination we pay particular heed to the MSPB's interpretation, *Frazier v. Merit Systems Protection Board*, 672 F.2d 150, 162 (D.C.Cir.1982), we are aware that it is ultimately our task to resolve the question of law presented in these appeals, *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981), and that we must "ensure that the MSPB is assuming the appellate role Congress intended it to have under the CSRA," *Atwell v. Merit Systems Protection Board*, 670 F.2d 272, 282 (D.C.Cir.1981).

Upon undertaking this review, we agree with the Board that it lacked jurisdiction over petitioners' appeals. To explain our conclusion, we begin with the fact, central to the *Taylor* decision and therefore to the Board's dismissals in the instant cases, that the Board possesses jurisdiction only if petitioners' cases are appealable to it under some law, rule, or regulation. 5 U.S.C. § 7701(a) (Supp. III 1979).[18] We therefore must examine each of the provisions arguably rendering these actions appealable, reading those provisions, when it is appropriate to do so, in light of the amended definition of "employee" contained in section 2105(c).

### A.

█ We begin by addressing the argument, which petitioners at times seem to advance, that amended section 2105(c) itself makes their job removals appealable to the Board. Petitioners posit the existence of a "presumption" that nonappropriated fund personnel are entitled to all the rights of federal employees, including rights of appeal to the MSPB. The section 2105(c) amendment, they continue, removes their express exclusion with respect to the latter and therefore entitles them to the benefits of this "presumption." Petitioners' Br. at 26.

These suppositions are indefensible in light of the Act's language and structure. The requirement that petitioners' actions be "appealable under any law, rule, or regulation," 5 U.S.C. § 7701(a) (Supp. III 1979), cannot be satisfied by a "presumption" not rooted in some specific provision. Neither can section 2105(c), a definitional provision, provide the necessary jurisdictional basis. As we shall see, however, the definition will be relevant in interpreting other provisions under which petitioners' actions are said to be "appealable."

### B.

Petitioners place primary reliance on section 7513, 5 U.S.C. § 7513 (Supp. III 1979), which sets forth the rights of employees against whom an agency takes one of several enumerated adverse actions, including job removals. The section lists substantive and procedural standards to which an agency must adhere in taking such an action, and confers on an employee subject to the action a right to appeal to the MSPB: "An employee against whom an action is taken under this section is entitled to appeal to the Merit Systems Protection Board under section 7701 of this title." *Id.* § 7513(d).

To demonstrate that this right of appeal is available to them, petitioners press an

---

17. A reviewing court must also set aside MSPB orders obtained without adhering to procedures required by law, rule, or regulation, 5 U.S.C. § 7703(c)(2) (Supp. III 1979), or unsupported by substantial evidence, *id.* § 7703(c)(3). The nature of petitioners' challenge calls into play neither of these standards.

18. Section 7701(a) states in part: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." The Board has authority to hear and adjudicate "all matters within the jurisdiction of the Board under this title ... or any other law, rule, or regulation." *Id.* § 1205(a)(1). Of course, "as an administrative tribunal created by Congress, [the MSPB] has only that jurisdiction granted it by the statutes empowering it to act." *Atwell v. Merit Systems Protection Board*, 670 F.2d 272, 280 (D.C.Cir.1981).

argument that rests on the amendment to section 2105(c). Because that section excludes them from "employee" status only for purposes of laws administered by the OPM, petitioners claim to be "employees" for purposes of section 7513(d), which concerns appeals to the MSPB and therefore is said to be "administered" by the MSPB.

This argument fundamentally misreads section 7513(d). Petitioners make a critical error in supposing that they can be counted as "employees" for the isolated purpose of appealing to the MSPB. A straightforward examination of section 7513 reveals that an individual cannot be an "employee" entitled to appeal under subsection (d) unless he is also an "employee" for purposes of the appealed-from action.

This principle emerges upon a full reading of section 7513. Subsection (d) does not confer an appeal right to all employees, but only to those "against whom an action is taken under this section." An "action" is described in subsection (a): "Under regulations prescribed by the Office of Personnel Management, an agency may take an action covered by this subchapter [*e.g.*, removals, reductions in pay] *against an employee* only for such cause as will promote the efficiency of the service." (Emphasis supplied.)

In other words, to be appealable an action must be "taken under this section," and to be taken "under this section" the action must be taken against one who is an "employee" within the meaning of the adverse action provisions, *id.* §§ 7511–7514. It therefore makes no sense to argue, as petitioners do, that they can be "employees" simply for purposes of appealing to the Board. Rather, petitioners have a right to appeal only if it can be shown that they are "employees" for purposes of adverse actions under section 7513.

That this showing cannot be made becomes clear when we inspect the two provisions relevant to defining "employee" for purposes of section 7513. According to the first, section 2105(c), petitioners are not employees for purposes of OPM-administered laws, other than exceptions not applicable in this context. We think it plain that the OPM "administers" the provisions under which adverse actions are taken.

The functions of the Director of the OPM, set out in section 1103, include "executing, administering, and enforcing the civil service rules and regulations . . . and the laws governing the civil service . . . ." *Id.* § 1103(a)(5)(A). It is true that this responsibility does not extend to matters "for which the Merit Systems Protection Board . . . is primarily responsible." *Id.* § 1103(a). In the context of adverse action proceedings, however, discerning the boundaries of these respective responsibilities is not difficult, and points clearly to the OPM's authority for "administering" those actions. The MSPB has responsibility for hearing the actions properly appealed to it, and for promulgating regulations in furtherance of that function.[19] The OPM, on the other hand, oversees the systems under which adverse actions are taken, a responsibility expressly reflected in section 7513(a), which permits an agency to take such actions "[u]nder regulations prescribed by the Office of Personnel Management."[20]

---

**19.** *See* 5 U.S.C. §§ 1205(a)(1), 7514 (Supp. III 1979). The legislative history fully supports this characterization of the Board's role. The House Report notes that, under pre-CSRA law, the CSC was both the chief personnel administrator and the adjudicator of personnel actions. One aim of the Act, the Report continues, was to divide these functions between separate bodies. H.R.Rep.No.95–1403, *supra*, at 6, *reprinted at* I Legislative History at 643. By contending that the MSPB to some extent "administers" adverse actions, petitioners' br. at 35, petitioners ignore Congress's intent to separate the administrative function from the appellate function and to entrust the latter to the MSPB.

The MSPB, of course, has responsibilities outside the adverse action context. For example, the Board has power, upon petition by the Special Counsel, to enforce and monitor compliance with section 2302, 5 U.S.C. § 2302 (Supp. III 1979), which enumerates prohibited personnel practices. *Id.* § 1205.

**20.** As the Board stated in *Taylor*,

OPM has the responsibility to regulate as to employee coverage and as to the procedural requirements an agency must satisfy to conform with law in effecting adverse actions and other matters that are appealable to the Board. The Board, on the other hand, has

■ Application of the section 2105(c) definition, therefore, leads to the following conclusions: petitioners are not "employees" for purposes of section 7513; their job removals were therefore not actions taken "against an employee under this section;" and as a result the removals are not appealable to the Board under section 7513(d).

Before resting on these conclusions, however, we must take note of a second provision possibly relevant to deciding whether petitioners are "employees" under section 7513. That provision is section 7511, id. § 7511, which contains definitions, including that of "employee," applicable to sections 7511 through 7514. Determining whether this definition affects the status of nonappropriated fund personnel, who are not "employees" by reason of section 2105(c), requires us to interpret the section 7511 definition in light of the relationship between it and section 2105(c).

■ This analysis leaves us with no doubt that section 7511 does not modify section 2105(c) in any way relevant to the status of nonappropriated fund personnel. Section 7511(a)(1) defines as "employees" certain "competitive service" and "preference eligible" individuals. We need not explore in detail the meaning of these two terms to conclude that Congress did not intend, by their inclusion, to alter section 2105(c)'s effect on nonappropriated fund personnel. The terms "competitive service" and "preference eligible" [21] are central to and employed throughout the Act's system of categorizing personnel and defining the rights and obligations attaching to those catego-

ries. These terms, however, are not used in connection with, or to define the status of, nonappropriated fund employees. Instead, Congress's practice has been to define the rights of the latter by expressly including them within the coverage of specific laws. See, e.g., id. §§ 5342(a)(2)(B) (1976), 7103(a)(3) (Supp. III 1979). See also United States v. Hopkins, 427 U.S. 123, 128, 96 S.Ct. 2508, 2511, 49 L.Ed.2d 361 (1976). Congress took no such action in connection with the adverse action system set forth in sections 7511 through 7514, a passivity especially telling when we recall that nonappropriated fund workers indisputably could not appeal adverse actions under the pre-CSRA version of those provisions.

We conclude, therefore, that section 7511(a)'s categories have no bearing on nonappropriated fund personnel, and that the exclusion worked by section 2105(c) extends to section 7513. Since petitioners are not "employees" under the latter provision, their job removals were not "actions taken under this section," and therefore are not appealable under section 7513(d).[22]

C.

■ Petitioners also claim that their removals are appealable to the Board because those actions constituted "prohibited personnel practices" in violation of section 2302, 5 U.S.C. § 2302 (Supp. III 1979). We need not address all the issues raised by this contention because, as we will explain below, the Board has jurisdiction to entertain such allegations only in the context of a

the responsibility to promulgate implementing regulations concerning the appellate processing of appeals from actions that are appealable to the Board under law, rule, or regulation.
2 M.S.P.B. at 8, J.A. 92.

21. See 5 U.S.C. § 2102 (1976 & Supp. III 1979) (defining "competitive service"); id. § 2108(3)–(4) (defining "preference eligible").

22. The CSRA also includes a new system for employee performance appraisal, 5 U.S.C. §§ 4301 -4305 (Supp. III 1979), and gives to specified employees a right to appeal to the Board from an "action based on unacceptable

performance," id. § 4303(e). Petitioners have not argued that their job removals are appealable under this provision, an argument that would confront obstacles similar to those we have described in connection with section 7513(d). As a minimum, petitioners would have to show that they are "employees" for purposes of section 4302. The OPM, however, plainly "administers" the provisions of law governing performance appraisals and actions based on unacceptable performance. See id. §§ 4302(b), 4303(b)(2), 4304, 4305; H.R.Rep. No.95–1403, supra, at 20–21, reprinted at I Legislative History at 657–58.

"corrective action proceeding" brought by the Special Counsel.

The Act gives, for the first time, a statutory statement of the broad merit principles governing the federal personnel system. *Id.* § 2301. In addition, it enumerates certain prohibited personnel practices violative of those principles and of other laws, and details procedures for enforcing that prohibition. *Id.* § 2302. The Special Counsel, an independent office in the MSPB, *id.* § 1204, has authority to receive and investigate allegations of prohibited personnel practices, to seek an accommodation with the agency involved when "reasonable grounds" support the allegation, and to request the Board, when efforts at accommodation fail, to consider the matter. *Id.* § 1206; *see generally Frazier v. Merit Systems Protection Board*, 672 F.2d 150 (D.C.Cir.1982). Upon receiving such a request, and after allowing the agency involved and the OPM to comment on the matter, the Board has authority to order appropriate "corrective action." *Id.* § 1206(c)(1)(B). Such "corrective action proceedings" have no counterpart in pre-CSRA law.

These enforcement provisions make clear that an allegation of a prohibited personnel practice cannot be taken to the Board in the context of an individual employee appeal under section 7701.[23] Instead, the aggrieved individual must seek relief by bringing the allegation to the Special Counsel.[24] This path is marked by the plain terms of the statute: "The Special Counsel shall receive any allegation of a prohibited personnel practice ...." 5 U.S.C. § 1206(a)(1).

This exclusivity comports with the nature of the corrective action proceeding. In contrast to employee appeals brought under section 7701, which seek Board resolution of individual employment disputes, the primary function of corrective action proceedings is to enforce the public interest in a merit system free of abuses. *Frazier*, 672 F.2d at 162–63. With respect to this goal, Congress determined that prosecutorial responsibility should lie in the hands of an independent Special Counsel obligated to investigate charges and to seek agency action before requesting formal action by the Board. Plainly, to permit petitioners to take their requested route would be to ignore the Act's language and undermine its detailed enforcement scheme.

We therefore agree with the Board's conclusion that petitioners' job removals, if viewed as allegations of prohibited personnel practices, are not appealable by petitioners to the Board under any law, rule, or regulation. As a result, we need not decide whether section 2302's proscriptions apply to agency actions taken in respect of nonappropriated fund employees.

## D.

■ Nonappropriated fund personnel are expressly made subject to Title VII of the CSRA, which creates a statutory structure for labor-management relations in the federal sector.[25] Petitioners claim that their

---

**23.** Of course, the action claimed to constitute a prohibited personnel practice might be appealable to the Board on some other ground—for example, as an action based on unacceptable performance under section 4303, 5 U.S.C. § 4303 (Supp. III 1979), which is appealable to the Board under section 7701. In such a case, as we noted in *Frazier*, 672 F.2d at 163, the individual "could presumably seek the assistance of the Special Counsel in a Chapter 77 appeal or forego that route entirely and rely on the Special Counsel to remedy the separation through a corrective action petition." (Footnote omitted).

**24.** We do not address whether an individual employee has a right to challenge the Special Counsel's disposition of his allegation. *See Frazier*, 672 F.2d at 162 n.41.

**25.** The definitions applicable to Title VII are set out in 5 U.S.C. § 7103(a)(2)(A) (Supp. III 1979). That section defines an "employee" as an individual employed in an "agency," and an agency is defined to include "a nonappropriated fund instrumentality described in section 2105(c) of this title," *id.* § 7103(a)(3).

removals are appealable under one provision of this title, section 7121, 5 U.S.C. § 7121 (Supp. III 1979). The section requires that collective bargaining agreements negotiated under the provisions of Title VII provide for procedures to settle "grievances," a word defined to include an employee's complaint concerning some aspect of his employment. *Id.* § 7103(a)(9). In general, such a "negotiated grievance procedure" is to serve as the exclusive means for resolving grievances falling within its coverage. *Id.* § 7121(a).

An exception to this exclusivity arises, however, when the action of which an employee complains is covered not only by the negotiated grievance procedure, but also by section 2302 (prohibited personnel practices) or by section 7512 (personnel actions such as job removals).[26] In such a case, the employee may choose to make use of either the negotiated grievance procedure or the statutory procedure applicable to the action. In other words, if the complained-of action is covered under section 7512, the employee may opt for either the negotiated grievance procedure or the appeal to the MSPB granted in section 7513(d). Or, if the action constitutes a prohibited personnel practice, the employee may choose either to use the negotiated grievance procedure or to take the action to the Special Counsel under section 1206.

Petitioners construct an argument from this statement of alternatives by first contending that their removals are covered not only by section 7121, but by sections 7512 and 2302. As a result, they claim, section 7121 may be read to grant them the statutory remedy applicable to section 7512 actions—an appeal to the MSPB under section 7513(d). By the same logic, and on the

mistaken assumption that the Act permits an individual to appeal a prohibited personnel practice directly to the MSPB, *see* page 788 *supra,* petitioners add that section 7121 also grants them the statutory remedy that they think is applicable to prohibited personnel practices—again, an appeal to the MSPB.

Petitioners overlook the fundamental point that section 7121 is not an affirmative grant of the remedies specified elsewhere in the Act. Rather, it merely allows an employee to choose the statutory route in lieu of the negotiated grievance route when the former is otherwise available. Because, as we have already explained, petitioners cannot appeal to the Board by virtue of either section 7513 or section 2302, the choice allowed by section 7121 advances their efforts not at all.

### E.

Petitioner Perez, who alleges that discrimination motivated his job removal, contends that the Board has jurisdiction over his appeal under section 7702, 5 U.S.C. § 7702 (Supp. III 1979), which details procedures for resolving allegedly discriminatory actions that fall within the jurisdiction of both the MSPB and the Equal Employment Opportunity Commission ("EEOC"). In relevant part, the section requires the Board, when faced with such an action, to expedite its decision so that the complaining employee may then request the EEOC to consider that decision. Noting correctly that nonappropriated fund employees are covered by several statutory prohibitions of discrimination,[27] Perez argues that the special procedure outlined in section 7702 evinces a congressional intent to allow appeals to the

**26.** A similar exception exists with respect to matters covered by section 4303 (actions based on unacceptable performance). 5 U.S.C. § 7121(e)(1) (Supp. III 1979). *See* note 22 *supra.*

**27.** For example, nonappropriated fund workers fall within the coverage of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 203(e)(2)(A)(iv), 206(d) (1976), and the Age Discrimination in Employment Act, 29 U.S.C. § 633a (1976).

Board in the first instance of discrimination-based actions.

This conjecture ignores the plain language of section 7702, whose procedures apply only to actions "which the employee ... may appeal to the Merit Systems Protection Board." *Id.* § 7702(a)(1)(A). Once again, petitioner's argument tries to find a right of appeal in a provision that assumes a right of appeal. Once again, we reject that effort.

## IV.

Although the MSPB is the descendant of the CSC's appellate arm, the jurisdictional boundaries of the two bodies necessarily differ as a result of the numerous changes wrought by the Act. For that reason, we have analyzed in some detail petitioners' assertion, which rests primarily on a technical or conforming amendment, that the CSRA conferred jurisdiction on the Board over adverse action appeals brought by non-appropriated fund employees. Fully persuaded that no provision allows the Board to entertain such appeals, we affirm its dismissals of them.

*It is so ordered.*